### STATE *v.* PIKE & A.

The declarations of one of several persons engaged in a concerted attack upon the dwelling and family of another, made while the attack is going on, are admissible against all; but if made after the attack has terminated, and is a mere narrative of a past occurrence, they are not admissible.

The finding of the judge who tried the cause, that the concerted attack was still going on, is sufficient to authorize the admission of such declarations, with proper instructions, unless, at least, it appear clearly from the evidence that the fact was otherwise.

THIS was an indictment, found by the grand jury at the September trial term, 1870, wherein the respondents, John S. Pike, Luther H. Downing, and Cyrus D. Willey, were charged with wilfully and maliciously, and with force, &c., breaking in the doors of the dwelling-house of one George W. Shapleigh, in Middleton, in this county, on the night of the 14th of October, A. D. 1869, and with force, as aforesaid, did then and there break and injure the doors of said house, and break and smash the glass of one of the windows of the same, whereby the real estate of said Shapleigh was greatly injured, contrary to the form of the statute in such cases made and provided, &c.

At the trial before the jury at said term, it appeared, from the evidence offered in behalf of the State, that about midnight of the 14th of October, 1869, the respondents forcibly broke and entered into the dwelling-house of said Shapleigh, and the outer door thereof was some injured, and the bar that fastened the same was broken, and some of the glass in a side window also broken, the respondents avowing the purpose to the family, then in the house, that they came there with the design of clearing them all out. It also appeared that G. W. Shapleigh, the owner of the house, was at the time sick in the house ; his wife, Anna, and son-in-law, R. P. Lougee, and his children, George H., Jennie, and Anna E., all testified that they were in the house at the time of the attack, and were roused from their sleep by the noise, and testified generally, and more or less in detail, to the transaction, or things done and words spoken at the time by the respondents. It appeared, also, that a quarrel and hard feelings then and before existed between the Shapleighs and Pike, the respondent, who resided in that neighborhood, and that both Downing and Willey were then in the employment of said Pike, and slept at his house. Four of said witnesses testified to the midnight noise, the forcible entry into the house, and that all three of the respondents were found in the bar-room of the house, and remained there for some time, using threats and violent language. It was contended by the respondents, and in proof from all of them, that although all of them were present at the outside of the house at the time alleged, yet no attack whatever was:

made upon said dwelling-house with the intent to injure it or its inmates; that said Willey alone, after rapping at the door, entered the house by license, for the purpose, as he said, of procuring some liquor for himself, and that permission was given, as he said, by George H. Shapleigh, to enter in, but he was not allowed to have any liquor; while all testified that Pike and Downing remained on the outside of the house, and did not enter or injure the house in any manner whatever.

The whole evidence, though contradictory in its character, was submitted to the jury, who rendered their verdict against all of the respondents. This verdict the respondents now move to set aside and for a new trial, because the court, against the defendants' exception, received as evidence against all of the respondents the testimony of Jennie M. Lougee, that Willey, about half an hour after all the others had left, came back to the house and wanted to stay all night, and told her " that he did not want us to blame him; that he should not have done what he did if Pike had not persuaded him to do it; that Pike said if he would help him do it, he would pay the expenses if there should be any; that Pike and Downing broke the door open, and he came in with them; that Pike was mad with him because he did not do more than he did, and that, if we would not prosecute him and would prosecute them, he would go as an evidence against them; that Pike had treated him and Downing at Farmington, and had bought a pint of liquor, and had treated them a number of times coming up from Farmington, and had persuaded him to drink, and that they had all drank." Witness said also, " Upon looking over his whole conduct that night, we suspected him and his talk, and declined to let him stay there that night." She further testified that " while we were all on the piazza in front of the house, talk was had by some of us about prosecutions. Willey came along, and put his hand upon my shoulder and told me to say what I pleased, and if they came back into the house again, he would help to put them out." Pike, then standing on the piazza, said, " Cyrus, are you going to back down on us? This is not what you agreed to, when you were coming up to-night." Then Cyrus slapped his hands together, and said,—"*No, sir.* I stand ready to do what we agreed to do. Say the word, and I will now do it. If they do not go in and close the door, there will not be anything left of them in the morning." Witness then stepped back and shut the door, and turned the button of the door. " Told Downing to move his horse away from the door. He did move it away. They soon went off. Soon after, they came back again and tried to get in. We stood against the door and prevented their entrance. When Willey was in the bar-room first, he sat down on the lounge and talked with my husband, and told him pretty much what he afterwards told me, as near as I could hear. He professed to be friendly, but we suspected him."

Reuben P. Lougee testified in substance as follows: " I married Jennie, the daughter of George W. Shapleigh; lived in the same house with him at the time of the attack on the night of the 14th of October; went to

bed about half past nine o'clock; my wife and I were the last up; my wife barred the door; one end of the bar was placed against the panel, about the middle of the outside door; the other was placed against the bottom of the stairs leading up chamber from the front entry. About midnight I was awakened by a loud noise on the front side of the house near the door; we slept up chamber; my wife and I got up as soon as we could; we went down the back stairs and soon arrived at the bar-room; met Mrs. Shapleigh coming out; found George Shapleigh, my brother-in-law, there; also the respondents; Willey stood leaning against the bar; Pike stood about midway of the room, and Downing near the front door; Pike said, ' I came in to clear out the whole d——d tribe of you, and I am going to do it;' he walked round the room much excited; he caught up a chair standing there, and threw it with great violence across the room; there was a lounge in the room; after talking a while I sat down on that; Willey soon came and sat down by my side; he said he did not want us to blame him, as Pike had told him to do this; said they had been down to a Crispins' meeting at Farmington that night; Pike had bought them a pint of liquor, and made him drink a number of times; when coming along home Pike said, ' We will raise hell with the Shapleighs to-night;' Downing said, ' They will prosecute us if we do;' Pike then said, ' They will not dare to do that, for we will then prosecute them for selling liquor; we have already made them pay $75, and we have got them where we want them;' Downing then said, ' Let us go home;' both Pike and Downing then left the house, followed by my wife and George; Willey remained in the room; while Pike was standing on the piazza, I recollect of him asking Willey if he was going to back down on them; Willey answered, he was not, and if he, Pike, said the word, ' we would clean them all out now, and if they don't shut up the door, we will do it anyway before morning;' we then closed the outer door; my wife and I stood against the door on the inside; I heard some one come and kick against the door two or three times; there was a square of glass broken out from one of the side lights of the door; the glass lay about the entry; the bar of the door was broken off about a foot from the end; Willey came back soon, within twenty-five or thirty minutes; he said ever since he had been to work for Pike he had been trying to have him go with him and make the attack, and that he had refused to let him put his horse upon his land that night because he had not done more here; all the respondents had been drinking, according to appearances, and Pike more than the rest."

On cross-examination: "The attack was about midnight; said he was persuaded by Pike to come and help break into the house; he did not want to come with them; that Pike got a bottle of liquor and treated them; they went into the entry before Willey got done talking with me; I think they could hear our talk; I heard Willey also talking with my woman about the matter; I soon afterwards heard a carriage drive away from the door; I never saw the bruises on the outside of the door before; both Willey and Downing were at work for Pike, and

stayed there nights; Pike resided about one hundred rods from the Shapleigh house; when Willey went out to go home, he found his horse and carriage gone; Willey rode home with Pike and Downing; it was a dark night."

It was in testimony that Willey and Pike again rode back in search for Willey's horse and carriage; this was said to be the time when they rapped at the door of the Shapleigh house, when Lougee and wife stood at the door and resisted entrance; they again drove home to Pike's; found the Willey horse and carriage upon Pike's premises; it was then that Pike accused Willey of turning traitor to him, causing him to be abused and injured by the Shapleighs, and being more friendly to them than to him; he, Willey, denied it, and said he had not set them on to Pike; Pike told him he had; upon this dispute Willey went back and had the conversation with Mrs. Lougee to which the respondents excepted, representing that Pike had refused to put up his horse, and had accused him of treachery to him; and Lougee and wife suspected him of being guilty of a like offence to them, and declined to harbor him at their house; whereupon Willey left and went back to Pike's house, and slept with Downing the remainder of the night.

Under these circumstances, the court received the declarations of Willey to Mrs. Lougee, at his last visit to Shapleigh's, as evidence against all the respondents, on the ground that they were the statement of a previous concerted attack, and of an actual outrage upon the peace of the family and their property, then going on and terminating only when Willey was finally ordered to leave the house that night,— and not as the recital of events which had already passed. The court, among other things, told the jury that before they found the respondents guilty, they must find that they wilfully, or intentionally and maliciously, inflicted an actual injury upon the real estate or house of Shapleigh; the injury must be by design, and not by license or accident; that in misdemeanors of this nature, all aiding, abetting, or assisting therein were principals; that when two or more jointly combine together for the unlawful purpose to injure the property of another, while all were engaged in furtherance of such illegal purpose, the declarations of one could be used as proof against all.

To this proposition the counsel of the respondents excepted.

*Hall, Solicitor,* for the State.

*Small* and *Sanborn,* for the respondents.

BELLOWS, C. J. The declarations of Willey, which are objected to, were made about half an hour after the respondents had gone away, and Willey had returned.

If the concerted attack upon the house was ended at this time, their declarations had the character of a mere narrative, and were inadmissible.

If, on the contrary, Willey's attempt to gain admittance at this time was in pursuance of the common design, either by facilitating the entrance of the other respondents, or to enable him to harass the family, it might well be considered that the attack was still going on, and then Willey's statements were admissible.

They were in fact received, as the case finds, upon the ground that the concerted attack upon this family was still going on, and did not terminate until Willey left, after making this statement and failing to get permission to stay all night.

The judge who tried the cause found, it would seem, that this last attempt of Willey to gain admission was a continuation of the common object, and unless the circumstances were such as clearly to negative such a conclusion, it must be assumed that the view of the court was correct, so far, at least, as respects the admission of the testimony in the first instance.

It would have been proper, however, to have submitted the question of fact to the jury, with instructions that, if they found the concerted attack had terminated when the respondents left, this testimony was to be laid aside.

As bearing upon the finding of the court on this point, it will be observed that Willey had before made substantially the same statement when the other respondents were present, and afterwards offered to Pike to aid him in the violence they had concerted; and there was reason to think that the last statement was equally insincere.

Upon the whole, we do not think there was error in assuming that the attack concerted by the respondents was still going on, so far as to receive the testimony of Willey's statements and submit it to the jury with proper instructions,—which we must, in the absence of exceptions, presume were given.

If these declarations of Willey were a mere narrative of occurrences that were past, though by a person otherwise proved to be an accomplice, they would not be admissible to affect the others; but if made during the progress of the violence, and in furtherance of the common design, they would be admissible against all. The rule, indeed, was laid down in *Rex* v. *Hardwick,* 11 East 585, much more broadly, namely, that if persons are shown to be co-trespassers, the declarations of one, as to the motives and circumstances of the trespass, will be evidence against all who are proved to be so combined.

With the necessary qualifications that such declarations were made while the acts complained of were in progress, and not merely a narrative of a past occurrence, and that they were made in reference to the common design and perhaps in furtherance of it, the rule announced in *Rex* v. *Hardwick* is, we think, correct. 1 Phillips Ev. 94, and Cowen's note, 2d vol. 176, note 179; 1 Greenl. Ev., sec. 111, and cases cited; *Page* v. *Parker,* 40 N. H. 62, 63, and cases; *Lee* v. *Lamprey,* 43 N. H. 13;—and this doctrine is in conformity with that of *State* v. *Larkin & a.,* 49 N. H. 39.

*Judgment on the verdict.*